ANDREA T. MARTINEZ, Acting United States Attorney (#9313)
TODD C. BOUTON, Assistant United States Attorney (#17800)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682
Email: todd.bouton@usdoj.gov

**SEALED**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. CHARLES ROBERT BREWER, Defendant. | INDICTMENT<br><br>VIOLATIONS:<br><br>COUNT 1: 18 U.S.C. § 1349 Conspiracy to Commit Wire Fraud<br><br>COUNT 2: 18 U.S.C. § 1956(h) Conspiracy to Commit Money Laundering |

The Grand Jury Charges:

Case: 2:21-cr-00248
Assigned To : Campbell, Tena
Assign. Date : 6/9/2021

<u>**COUNT 1**</u>
**18 U.S.C. § 1349**
**(Conspiracy to Commit Wire Fraud)**

### I. <u>BACKGROUND ALLEGATIONS</u>

At all times relevant to this Indictment:

1.  The defendant, CHARLES ROBERT BREWER ("BREWER"), was a resident of Los Angeles County, California. BREWER sometimes used the aliases, Robert Brewer and Scott Brewer.

2. Beginning on or about February 2016, with the exact date unknown to the United States, and continuing until on or about February 2017, BREWER was involved in a scheme to process payments received by telemarketing rooms selling fraudulent products and services.

3. The telemarketing rooms consisted of call centers based in and around Phoenix, Arizona and in other areas of the United States. Sellers at the call centers used the telephone to make interstate calls seeking to sell fraudulent goods or services to a consumer for payment.

4. The telemarketing rooms sold different fraudulent products, including but not limited to, "Amazon Rooms and accompanying advertising," "government grants," and "business opportunities." BREWER and others worked together as part of a plan, program, and campaign related to the business of merchant processing for the telemarketing rooms.

5. A "fulfillment" operation based in and around St. George, Utah, managed ancillary services and products sold by the telemarketing rooms. BREWER was knowledgeable of and worked with the fulfillment operation. In truth, the fulfillment operation was little more than an operation to further the fraud by fighting, opposing, and delaying chargebacks. A "chargeback" is an industry term for the process by which consumer banks challenge fraudulent transactions at the request of a consumer, in order to obtain a refund or reimbursement for the fraudulent transaction.

6. BREWER and his co-conspirators Chad Gettel, Peter Seldin, Jamie White, William Rogers, Parker Crow, and others (collectively, the "CO-CONSPIRATORS"),

worked together as part of a plan, program, and campaign to devise a scheme to process these fraudulently obtained payments for the telemarketing rooms.

## II. THE CONSPIRACY

7. Beginning in and around February 2016 and continuing to and in around February 27, 2017, within the Central Division of the District of Utah and elsewhere,

**CHARLES ROBERT BREWER,**

defendant herein, did knowingly and willfully combine, conspire, confederate, and agree with his CO-CONSPIRATORS, with interdependence among the members of the conspiracy, to commit a fraud crime listed in United States Code, Title 18 Chapter 63, namely: Wire Fraud in violation of Title 18, United States Code, Section 1343.

## III.     OBJECT OF THE CONSPIRACY

8. The object of the conspiracy by BREWER and his CO-CONSPIRATORS was to capture money from telemarketing fraud by identifying potential nominee victims through whom BREWER, Chad Gettel, and others, using fictitious names, could create business entities and then fabricate false bank and company records in order to open merchant accounts with maximized credit card processing limits. BREWER and his CO-CONSPIRATORS would then process charges from the telemarketing fraud through the merchant accounts and fight legitimate chargebacks from defrauded customers to keep the accounts open for as long as possible. BREWER and his CO-CONSPIRATORS' goal was to continue to divert money from the fraudulent telemarketing for their own personal use and benefit before the merchant accounts were frozen or shut down for fraud.

## IV. MANNER AND MEANS OF THE CONSPIRACY

9.  The manner and means by which defendant BREWER and his CO-CONSPIRATORS sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

10. In execution and furtherance of the scheme and artifice to defraud, BREWER worked with a network of individuals, agents, affiliates and nominees, and the entities and financial accounts they created, and caused to be created, as part of the network that served the telemarketing rooms by supplying the rooms with merchant accounts. These merchant accounts enabled the telemarketers to:

   a. capture, authorize and process credit card account transactions;

   b. settle credit card transactions pursuant to merchant account agreements; and

   c. ultimately receive deposits from settled credit card transactions.

11. Merchant accounts were applied for under the names of a series of entities, typically limited liability companies ("LLCs"), created by, and through, nominees for the purpose of obtaining merchant accounts necessary for the telemarketing rooms.

12. It was part of the scheme and artifice to defraud that BREWER, Chad Gettel, William Rogers, Parker Crow, and others, created, identified and worked with these nominee companies and applied for, opened and held merchant accounts at federally insured financial institutions mainly located in Utah, including but not limited to, Wells Fargo Bank, US Bank, Brighton Bank, and Mountain America Credit Union. In

many cases, the nominees were unaware of the merchant accounts being opened in their names.

13. It was part of the scheme and artifice to defraud that BREWER, Chad Gettel, William Rogers, and Parker Crow, along with others, intentionally deceived the banks by creating false company profit history records (in the form of profit and loss statements) and false bank statements for the LLCs in order to assure that the merchant accounts would qualify for a higher credit card processing limit.

14. It was part of the scheme and artifice to defraud that BREWER, with others, oversaw the merchant accounts, which enabled the telemarketing rooms to accept and deposit payments from individuals via credit card and sometimes wire transfers.

15. It was also part of the scheme and artifice to defraud that BREWER and others contested chargebacks to these merchant accounts initiated by credit card customers of the telemarketing rooms in order to keep the merchant accounts open as long as possible. To contest the chargebacks, BREWER and others often fabricated documents and work logs and arranged to have Peter Seldin or others impersonate satisfied customers over the phone to fraudulently verify the transactions in order to contest legitimate chargebacks and to perpetuate the telemarketing scheme.

16. Eventually, banks would freeze the misused merchant accounts and discontinue allowing the accounts to accept credit card payments due to suspicious activity and the large numbers of chargeback requests. Once the accounts were frozen, the nominees and banks were left to deal with the outstanding chargebacks.

17. Once a particular merchant account was closed, BREWER, Chad Gettel, and the other CO-CONSPIRATORS would then shift payment processing to another merchant account they had created in the same manner.

18. This scheme allowed BREWER and his CO-CONSPIRATORS to siphon off hundreds of thousands of dollars from the telemarketing fraud, through the merchant accounts, before the banks could freeze the merchant accounts.

## V. <u>OVERT ACTS</u>

19. In furtherance of the conspiracy and in order to achieve the objects of the conspiracy, BREWER, aiding and abetting his CO-CONSPIRATORS, used and caused the use of wire communications in interstate and foreign commerce, to communicate with the CO-CONSPIRATORS, with banks, with payment processing companies, and with merchant account nominees.

### "Creatives"

20. In furtherance of the conspiracy and in order to achieve the objects of the conspiracy, BREWER knowingly sent by electronic mail or knowingly caused to be sent by electronic mail forged documents, called "Creatives." These documents included fraudulent bank statements, fraudulent profit and loss statements, and fraudulent (often altered) invoices. These Creatives were used to convince financial institutions and payment processing companies to set up merchant accounts in the name of nominee companies (or their owners) through which BREWER and his CO-CONSPIRATORS could process the fraudulent transactions from the telemarketing rooms.

### Emails to Payment Processor Cliq

21. In furtherance of the conspiracy and in order to achieve the objects of the conspiracy, BREWER also knowingly sent electronic mail to A.P., the CEO of Cliq, in which BREWER impersonated D.T., the CEO of Velocity Solutions, Inc. ("Velocity Solutions"). Cliq was a large payment processing company BREWER used to process the payments to the merchant accounts for Velocity Solutions and other fraudulently established and maintained "nominee" companies, so that BREWER and his CO-CONSPIRATORS could capture the funds from their fraudulent telemarketing scheme. BREWER fraudulently impersonated D.T. in emails and otherwise made misrepresentations to A.P. to mislead (or, if A.P. was participating in the scheme, to create the appearance of misleading) A.P. into thinking that Velocity Solutions and other companies with merchant accounts at Cliq were not engaging in fraud, even though BREWER knew they were.

### June 16, 2016 Email

22. In furtherance of the conspiracy and in order to achieve the objects of the conspiracy, on June 16, 2016, BREWER knowingly sent electronic mail to A.P., the CEO of Cliq, in which BREWER impersonated D.T., the CEO of Velocity Solutions. On June 16, 2016, BREWER either forwarded or directly sent to A.P. at least two emails from an email account that BREWER had set up in D.T.'s name and in the name of Velocity Solutions. In those emails, while impersonating D.T., BREWER knowingly made false representations to further the wire fraud scheme, and to encourage or mislead A.P. to agree, based on false information, to allow Velocity Solutions to continue to process

7

through Cliq a growing number of transactions that BREWER knew to be fraudulent. Those knowingly false representations included:

    (a)    falsely claiming that another company, Elavon, had closed Velocity Solutions' merchant account because of a nonexistent exclusivity clause as opposed to the real reason—which was that Velocity Solutions had too many chargebacks;

    (b)    falsely attributing Velocity Solutions' then-recent increase in transaction volume through Cliq to "accelerated growth" from increased media spend on search engine optimization ("SEO") and from a strong customer base that referred friends, family, and colleagues to purchase Velocity Solutions' nonexistent business start-up services, rather than the real reason—which was that BREWER and his CO-CONSPIRATORS had stepped up their efforts to sell fraudulent products to customers through the telemarketing rooms before the banks could close the related merchant accounts for having too many chargebacks;

    (c)    falsely claiming that Velocity Solutions was committed to working diligently with its customers to get the highest level of satisfaction, when in fact, BREWER and his CO-CONSPIRATORS were knowingly selling fraudulent products;

    (d)    falsely claiming that Velocity Solutions actually provided customers who were new business owners with custom website and logo design, blog writing, business plan help, social media, entity setup, and general

    document preparation, when, in fact, the company provided no such services; and

(e) falsely suggesting that Velocity Solutions ran a legitimate customer service operation and made customer service a company priority, when, in fact, under BREWER and his CO-CONSPIRATORS, the company did not.

### July 9, 2016 Email

23. In furtherance of the conspiracy and in order to achieve the objects of the conspiracy, on July 9, 2016, BREWER knowingly sent another email to A.P. (Cliq's CEO) in which BREWER forwarded another July 8, 2016 email in which BREWER had again impersonated D.T., Velocity Solutions' CEO, in purporting to send an email to himself (BREWER) that he then pretended to pass on to A.P. BREWER fraudulently tried to pass off the July 8, 2016 "D.T." email as having been created by D.T. in response to Philips' questioning the abnormally large number of chargebacks that Velocity Solutions was receiving (29 in just one and one-half weeks). These abnormally large chargebacks had caused Velocity Solutions to be placed in Mastercard's Global Merchant Audit Program and to be tasked with presenting a viable "Excessive Chargeback Reduction" plan if it wanted to continue to process Mastercard customer charges. In the fabricated July 8, 2016 email that BREWER forwarded to A.P. on July 9, 2016, BREWER falsely presented a purported "Chargeback Reduction Plan" for Velocity Solutions. This fraudulent "Chargeback Reduction Plan" falsely claimed that, among other things:

(a) The company had traced most of its problems to two sales agents who were no longer part of the sales floor, which was not true;

(b) Chargebacks could be traced to some of the customers' having not recognized the descriptor in the charges, which was not true;

(c) The company had set up new procedures for handling inbound calls in order to reduce the number of chargebacks, which was false; and

(d) The company was working to correct the situation that led to the excessive chargebacks, and D.T. was confident he could fix the chargeback problem, which was also not true. (D.T. was not aware of the problem.)

### August 5, 2016 Email

24. In furtherance of the conspiracy and in order to achieve the objects of the conspiracy, on August 5, 2016, BREWER knowingly sent another email to A.P. (Cliq's CEO) in which BREWER recapped a telephone call which he had conducted with A.P. on July 29, 2016 in response to A.P.'s concern about Velocity Solutions' chargebacks. In this email, and in the telephone call, BREWER misrepresented that:

(a) D.T. was actually on the line (He was not.);

(b) Velocity Solutions' call center manager—"Blake" (no last name)—was on the call (He was not.);

(c) "Blake" had failed to exercise sufficient oversight of the sales teams because he had been distracted (There was never any intention to do so.);

(d) "Blake" had listened to sales calls and had over the last two weeks terminated a few "bad apples" on the sales team that he had confirmed were responsible for the chargebacks (This was untrue.);

(e) In light of the past sales problems, BREWER would use his "extensive background in marketing" to connect A.P. and "Blake" with some better marketing agencies to clean up the sales traffic (This never happened.);

(f) Velocity Solutions would hire some new administrative personnel to conduct an extra verification call to reduce chargebacks (Not true.); and

(g) "Blake" was confident that these procedures would lead to a significant drop in the chargeback rate (None of the conspirators actually believed this or intended to implement the proposed procedures.).

In reality, Velocity solutions was not doing any marketing. And "Blake" did not even know about the July 29 telephone call. In furtherance of the scheme, BREWER knowingly used the telephone call and his follow-up email to deceive (or to create the appearance that he was deceiving) A.P. into believing that Velocity Solutions was running a legitimate, nonfraudulent business, and that BREWER could, and would, fix the chargeback problem.

### August 30, 2016 Email

25. In furtherance of the conspiracy and in order to achieve the objects of the conspiracy, on August 30, 2016, BREWER knowingly sent another email to A.P. (Cliq's CEO) in which BREWER falsely speculated that 14 or more recent reversals from customer chargebacks relating to Velocity Solutions might have been attributed to a "descriptor issue" or "buyer's remorse" from buying a "larger-ticket item." When

11

BREWER made these statements to A.P., BREWER knew the chargebacks at issue were a direct result of the telemarketing fraud that he and his CO-CONSPIRATORS were engaging in. BREWER, however, knowingly made these statements to A.P. suggesting possible alternative explanations for the chargebacks in order to further encourage A.P. to continue, or mislead A.P. into continuing, to allow Velocity Solutions to process payments through Cliq.

### September 13, 2016 Email

26. In furtherance of the conspiracy and in order to achieve the objects of the conspiracy, on September 13, 2016, BREWER knowingly sent another email to A.P. (Cliq's CEO) in which BREWER falsely represented that he would continue to provide A.P. with invoices and contact information for "customers" of Velocity Solutions and Bay Harbor Associates, LLC ("Bay Harbor"), another fraudulent merchant account that BREWER had been running through Cliq to further his and his CO-CONSPIRATORS' fraudulent scheme. BREWER mentioned that A.P. had conducted a previous audit of Bay Harbor customers and that A.P. had said they were "very happy last week." However, when BREWER sent the email, he knew that his coconspirator, Peter Seldin, had impersonated, and was continuing to impersonate, Velocity Solutions and Bay Harbor customers on a burner phone whenever A.P. called the numbers BREWER gave him to verify the customer transactions, and that BREWER, and others were providing A.P. with fraudulent customer invoices to continue to mislead A.P. (or at least to appear to mislead him) into thinking the telemarketing rooms were conducting a legitimate business.

27. Overt acts in furtherance of the conspiracy and attempts to further said conspiracy are also outlined below in the allegations and counts charged in this Indictment;

All in violation of 18 U.S.C. § 1349.

## COUNT 2
18 U.S.C. § 1956(h)
(Conspiracy to Commit Money Laundering)

28. The allegations set forth above and all counts set forth in this Indictment are incorporated herein by reference and realleged as though fully set forth herein.

29. Beginning in or around February 2016 and continuing to and around February 27, 2017, in the Central Division of the District of Utah and elsewhere,

**CHARLES ROBERT BREWER,**

defendant herein, did knowingly and intentionally combine, conspire, confederate, and agree with his CO-CONSPIRATORS to:

(a) conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, Wire Fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(b) engage in monetary transactions by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is Wire Fraud, contrary to Title 18, United States Code, Section 1957(a).

In furtherance of the conspiracy and to effect its illegal objects, BREWER and his CO-CONSPIRATORS did the following things, among others, in the Central Division of the District of Utah and elsewhere:

30.   In or before October 2016, BREWER and his CO-CONSPIRATORS set up fraudulently opened and maintained merchant accounts to process defrauded customers' credit card payments through T1 Payments, a payment processing company. BREWER and his CO-CONSPIRATORS then caused T1 Payments to funnel illicit funds from their fraudulent telemarketing business through T1 Payments' account at Bank of America to BREWER and his CO-CONSPIRATORS in order to launder the fraudulent proceeds.

31.   On October 24, 2016 and October 26, 2016, BREWER and his CO-CONSPIRATORS caused T1 Payments to transfer $34,591.13 and $44,747.62, respectively, in criminal proceeds through Compass Bank to BREWER's 99381 account at CPMC, LLC. BREWER, knowing the funds were from criminally derived property, caused this money to be transferred to his CPMC, LLC account for his personal use.

32.   These funds that BREWER caused to be transferred to his CPMC, LLC account were monetary transactions greater than $10,000;

33.   In a similar manner, from June 10, 2016 until February 6, 2017, through T1 Payments and other payment processing companies, such as Cliq, BREWER also

14

orchestrated and caused to be made at least 66 separate bank transfers to launder for his own personal benefit a total of at least $431,749.20 in criminal proceeds from the wire fraud conspiracy he executed with his CO-CONSPIRATORS;

All in violation of 18 U.S.C. § 1956(h).

### NOTICE OF INTENT TO SEEK FORFEITURE

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any offense charged herein in violation of 18 U.S.C. § 1349, the defendant shall forfeit to the United States of America all property, real or personal, that constitutes or is derived from proceeds traceable to the scheme to defraud or conspiracy to commit the same. The property to be forfeited includes, but is not limited to, the following:

- A money judgment representing the value of any property, real or personal, constituting or derived from proceeds traceable to the scheme to defraud or conspiracy to commit the same and not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p).
- Substitute property as allowed by 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p).

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any offense charged herein in violation of 18 U.S.C. § 1956(h), the defendant shall forfeit to the United States of America any property, real or personal, involved in such offenses, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

- A money judgment equal to all property involved in the money laundering charges and not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p).
- Substitute property as allowed by 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p).

A TRUE BILL:

/s/
FOREPERSON OF GRAND JURY

ANDREA T. MARTINEZ
Acting United States Attorney


TODD C. BOUTON
Assistant United States Attorney